[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Morris*, Slip Opinion No. 2026-Ohio-1519.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2026-OHIO-1519

THE STATE OF OHIO, APPELLANT, *v.* MORRIS, APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Morris*, Slip Opinion No. 2026-Ohio-1519.]

*Criminal law—Constitutional law—Right to counsel—Right to counsel guaranteed under Article I, Section 10 of Ohio Constitution did not extend to defendant's preindictment investigatory interview—Defendant's right to counsel under Sixth Amendment to United States Constitution attached when he made his initial appearance and court informed him of the charges against him, appointed him counsel, and set bail—Defendant did not unambiguously and unequivocally invoke Sixth Amendment right to counsel during interview—Court of appeals' judgment reversed and cause remanded to trial court.*

(No. 2023-1614—Submitted February 12, 2025—Decided April 30, 2026.)

APPEAL from the Court of Appeals for Hamilton County,

No. C-230108, 2023-Ohio-4105.

_____

DEWINE, J., authored the opinion of the court, which DETERS, HAWKINS, and SHANAHAN, JJ., joined. KENNEDY, C.J., dissented, with an opinion joined by LANZINGER, J., and by BRUNNER, J., except for Part II. JILL FLAGG LANZINGER, J., of the Ninth District Court of Appeals, sat for FISCHER, J.

**DEWINE, J.**

{¶ 1} During a police interrogation, Isaiah Morris confessed to multiple crimes. His court-appointed attorney was not present, but Morris waived his right to counsel at the beginning of the interview by voluntarily answering questions after having been informed of his right to have an attorney present.

{¶ 2} Morris later moved to suppress his confession. The trial court granted his motion. It concluded that the entire interrogation violated Morris's right to counsel under the Ohio Constitution. It also concluded that Morris clearly invoked his right to counsel 45 minutes into the interrogation, requiring the suppression of all statements after that point under the Sixth Amendment to the United States Constitution. The First District Court of Appeals affirmed that decision. It did so by relying exclusively on the Ohio Constitution, reasoning that it guaranteed a broader right to counsel than the Sixth Amendment to the United States Constitution. Specifically, the First District concluded that Article I, Section 10 of the Ohio Constitution—which says that "[i]n any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel"—prohibited a police interrogation of someone who was represented by counsel without that counsel's presence, even if the accused had waived the right to have counsel present. 2023-Ohio-4105, ¶ 54-55 (1st Dist.).

{¶ 3} The State appealed to this court, presenting propositions of law that asked us to consider two issues: (1) the scope of the right to counsel under the Ohio Constitution and (2) whether after initially waiving his right to counsel, Morris invoked that right under the federal Constitution by unambiguously and

unequivocally requesting an attorney partway through the interrogation. We accepted each of the State's propositions of law, agreeing to review both the Ohio Constitution issue and the federal Sixth Amendment issue.

{¶ 4} We conclude that there was no violation of the Ohio Constitution: its guarantee of a right to counsel "[i]n any trial, in any court," Ohio Const., art. I, § 10, was not implicated by the preindictment investigatory interview of Morris. As for the second issue, we hold that Morris did not invoke his right to counsel. We reverse the First District and remand the case to the trial court.

## I. BACKGROUND

### A. Morris Is Arrested and Questioned

{¶ 5} Morris was arrested for his involvement in several shootings. He was charged with carrying a concealed weapon, having a weapon while under a disability, and several counts of felonious assault with weapons specifications. After his arrest, he made his initial appearance before the municipal court. The court informed Morris of the charges against him, appointed a lawyer, and set bail.

{¶ 6} Later that same day, Morris joined Cincinnati Police Detectives Gleckler and Bender in an interview room in the Hamilton County Justice Center—a facility that houses the Hamilton County jail—to discuss the charges against him. At the time of the interview, Morris had not yet been indicted or arraigned. The interrogation was captured by Detective Gleckler's body camera.

{¶ 7} Detective Gleckler began the interview by making sure that Morris understood his *Miranda* rights and that he was competent to waive those rights. In response to Detective Gleckler's questions, Morris recounted that his *Miranda* rights had been read to him before, that he had made it through tenth or eleventh grade, that he could read and write, and that there were no drugs or alcohol in his system. Detective Gleckler then read Morris the following Cincinnati Police Department Notification of Rights form:

**YOUR RIGHTS**

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

\* \* \*\* \* \*\* \* \*\* \* \*\* \* \*\* \* \*\*\*

**I understand my rights**.

**Signed** _____

**Witness** _____

**Witness** _____

(Boldface in original.)  Morris confirmed that he understood his rights and signed the form.

{¶ 8} The interrogation proceeded uninterrupted for nearly two hours.  The first 40 minutes or so consisted of the detectives asking Morris questions related to a shooting that occurred in April 2022.  The detectives slowly laid out what they knew about that shooting.  They showed him security-camera photos of him fleeing the scene and a picture of a gun recovered from the scene that they said had his DNA on it.  Morris calmly confessed to that shooting.  He confirmed that the gun was his and said that he "took it from somebody."

{¶ 9} After gathering more details about the April shooting, the detectives began asking Morris about other crimes involving his gun. The detectives told Morris that his gun had "been busy" and was involved in multiple shootings "all over the place." Morris responded that he had just "got [the] gun in April."

{¶ 10} About 40 minutes into the interview, the detectives began to focus on a February 2022 incident at a pizza shop, where a woman had been shot in the foot. Detective Gleckler told Morris he did not think the shooting was intentional—because the bullet had bounced off the ground before striking the woman's foot—but "[his] gun was used for sure." Taken aback, Morris responded, "Who's—me? Nah, I didn't shoot no lady." He vehemently denied any involvement, again asserting that he had just obtained the gun in April. He insisted, "[W]hatever happened with that gun before that, it's not me—that don't got nothing to do with me." The detectives continued to press Morris, telling him that his DNA was on the gun and that a video showed a shooter that walked like Morris and wore similar clothes. "It sounds like y'all are trying to put something else on me that I don't got nothing to do with," insisted Morris.

{¶ 11} That brings us to a ten-second exchange that is at issue in this appeal. Frustrated, Morris asked: "Like, I can't talk to a lawyer?" Detective Gleckler responded, "Anybody can talk to a lawyer." He then paused and repeated: "Anybody can talk to a lawyer." Morris shook his head, and according to the trial court said, "[Y]eah cause that's—we goin' to do that because I don't know what you're talking about."

{¶ 12} The interrogation went on for another hour and 14 minutes. Morris never again mentioned a lawyer. He continued to insist that he wasn't involved in the February shooting. But he did confess to stealing a man's phone after trying to sell him marijuana.

{¶ 13} After his confession was secured during the interrogation, Morris was indicted on 14 counts—including 3 counts related to the marijuana deal that

turned into a phone theft and 9 counts related to the April shooting. None related to the February shooting.

**B. The Trial Court Suppresses the Entire Interrogation,**

**and the First District Affirms**

{¶ 14} Morris moved to suppress all statements that he made during the interrogation, including his confessions to the April shooting and the drug deal gone wrong. He argued that the interrogation violated his rights to counsel under both the United States and Ohio Constitutions.

{¶ 15} The trial court granted Morris's motion and ordered all statements that he made during the interrogation suppressed, making his confessions inadmissible at his trial. In doing so, the trial court made two constitutional determinations. First, it determined that the right to counsel in Article I, Section 10 of the Ohio Constitution is broader than the right to counsel in the Sixth Amendment and second, that Morris's Article I, Section 10 right was violated when police interrogated him without his lawyer.

{¶ 16} Although it ostensibly based its decision on the Ohio Constitution, the trial court focused much of its analysis on federal case law. It cited with approval a subsequently reversed line of federal precedent that held that if police initiate interrogation after a defendant asserts his right to counsel at an arraignment or similar proceeding, any waiver of that right at the police interrogation is invalid. *See Michigan v. Jackson*, 475 U.S. 625 (1986). The trial court acknowledged that the United States Supreme Court had overruled this line of precedent in *Montejo v. Louisiana*, 556 U.S. 778 (2009), when it held that a waiver of *Miranda* rights at a police interrogation is sufficient to waive the Sixth Amendment right to counsel. *See Montejo* at 794-795. The trial court, however, deemed *Montejo* "contrary not only to decades of precedential case law, but to the Ohio Constitution." Citing the "plain language" of Article I, Section 10, as well as several out-of-state decisions and the Ohio Rules of Professional Conduct, the court concluded that under the

Ohio Constitution "any statements [Morris] made without his counsel during an interrogation by the State after counsel was appointed cannot be entered into evidence at his trial."

{¶ 17} As an additional basis for its decision, the trial court determined that Morris invoked his right to counsel under the Sixth Amendment to the federal Constitution partway through the interrogation. It found that the brief back-and-forth between Morris and Detective Gleckler that began when Morris asked, "Like, I can't talk to a lawyer?" constituted a clear and unequivocal invocation of his federal right to counsel. Thus, it held, the Sixth Amendment required the suppression of all statements Morris made after that interaction—about an hour and 15 minutes of the interview.

{¶ 18} The State appealed, and the First District affirmed. The appellate court confined its holding to the Ohio Constitution, largely tracking the trial court's analysis of the Ohio provision. It framed the issue as "whether *Montejo* is consistent with the right to counsel under Article I, Section 10 of the Ohio Constitution." 2023-Ohio-4105 at ¶ 31 (1st Dist.). Looking at the text of the constitutional provision, it reasoned that "when read as a whole, Article I, Section 10 . . . safeguards the integrity and fairness of a criminal trial." *Id*. at ¶ 37. It also found that Ohio had long protected the attorney-client relationship and that under the Rules of Professional Conduct, attorneys take on obligations that "reflect the crucial role that attorneys play in presenting a defense and ensuring a fair trial." *Id*. at ¶ 42-43. Like the trial court, the First District looked to several out-of-state opinions and directed various criticisms at the United States Supreme Court's decision to overturn *Jackson* in *Montejo*. *Id*. at ¶ 44-53.

{¶ 19} The court ultimately concluded that even though the Supreme Court had overruled *Jackson*, it would follow the *Jackson* rule in its interpretation of Article I, Section 10 of the Ohio Constitution. It opined that the *Jackson* rule would more effectively deter police misconduct and protect the attorney-client

relationship. *Id*. at ¶ 44-49. Thus, it held that "when an accused's right to counsel has attached and an attorney has been secured, any uncounseled waiver of the defendant's right to counsel in a state-initiated interrogation is deemed invalid." *Id*. at ¶ 55. On this basis, it affirmed the trial court's suppression of all statements Morris made during the interrogation. *Id*. at ¶ 56-57.

{¶ 20} Judge Winkler dissented. He found the majority's conclusion that the Ohio Constitution provided a broader right than the federal Constitution difficult to reconcile "with the actual text of the two provisions." *Id*. at ¶ 69 (Winkler, J., dissenting). He explained that while the Ohio Constitution guarantees a right to counsel "[i]n any trial in any court," the federal Constitution's guarantee extends to "all criminal prosecutions," U.S. Const., amend. VI. In his view, this difference was "particularly notable" because the original Ohio Constitution of 1802 had used the "in all criminal prosecutions" language found in the federal Constitution and the change to "narrower language cuts against the view that Article [I], Section 10 is supposedly broader." *Id*. at ¶ 69.

## II. ANALYSIS

### A. The Trial Court Erred in Granting the Motion to Suppress

{¶ 21} We accepted the State's appeal on three propositions of law. 2024-Ohio-763. First, the State asks us to ascertain the proper scope of the Article I, Section 10 right to counsel. Second, it asks us to say whether Morris's Sixth Amendment right to counsel attached before his interrogation and, if so, whether he waived that right before the interrogation started. And third, it asks us to determine whether Morris invoked his federal right to counsel partway through the interrogation.

{¶ 22} We conclude that the State did not violate Morris's rights under the Ohio or federal Constitutions by interrogating him outside the presence of counsel after he had waived his *Miranda* rights. And we conclude that Morris did not invoke his right to counsel during the interrogation.

***1. Article I, Section 10 provides a trial right and is therefore narrower than the Sixth Amendment***

{¶ 23} Both the trial court and the First District determined that Article I, Section 10 of the Ohio Constitution provides a broader right to counsel than the Sixth Amendment. Morris echoes their reasoning, arguing that "Ohio's history, precedent, policy, and culture" indicate that the right to counsel is of great importance in this State. According to Morris, because the overruled rule from *Jackson* "more appropriately reflects the right to counsel as safeguarded by Article I, Section 10," this court should hold that it applies in the application of the Ohio constitutional provision.

{¶ 24} As we have explained, the interpretation of our state Constitution "should not be driven simply by disagreement with the result reached by the federal courts' interpretation" of the federal Constitution. *State v. Gardner*, 2008-Ohio-2787, ¶ 76 (lead opinion). Rather, "in construing our state Constitution, we look first to the text of the document as understood in light of our history and traditions." *State v. Smith*, 2020-Ohio-4441, ¶ 29. So, rather than jump as the lower courts did to a debate about the relevant merits of the United States Supreme Court's decisions in *Jackson* and *Montejo*, we begin with a more basic threshold question: Does Article I, Section 10 apply to the preindictment police interrogation at issue in this case?

{¶ 25} Article I, Section 10 was part of the original version of Ohio's current Constitution, adopted by the citizens of Ohio in 1851. It guarantees that "[i]n any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel," while the Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." Although both these provisions provide an accused the right to counsel, there are clear textual differences. So, rather than "ignor[ing] the plain language of our state Constitution and its unique history and tradition and

hook[ing] our wagon to the United States Supreme Court," *State ex rel. Cincinnati Enquirer v. Bloom*, 2024-Ohio-5029, ¶ 20-22, we must independently determine its meaning.

{¶ 26} It's helpful to first understand the textual differences. The Sixth Amendment guarantees a criminal defendant the right to "the Assistance of Counsel for his defence." And that right is guaranteed "[i]n all criminal prosecutions." The content of the substantive right to counsel comes from the "Assistance of Counsel" part of that provision, and the timing of its attachment comes from the "[i]n all criminal prosecutions" part. *See Rothgery v. Gillespie Cty.*, 554 U.S. 191, 214-217 (2008) (Alito, J., concurring). The United States Supreme Court has interpreted the substantive right to counsel to include the defendant's right to his lawyer's presence at all "'critical' stages" of a prosecution. *Montejo*, 556 U.S. at 786. A critical stage is, generally, any confrontation with the government where "potential substantial prejudice to [a] defendant's rights inheres in the particular confrontation" and the assistance of counsel would "help avoid that prejudice." *United States v. Wade*, 388 U.S. 218, 227 (1967); *see generally United States v. Ash*, 413 U.S. 300, 306-313 (1973). And the Supreme Court has determined that because the Sixth Amendment right to counsel applies "[i]n all criminal prosecutions," it attaches "once the adversary judicial process has been initiated," *Montejo* at 786. In other words, it attaches "at the first appearance before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty." *Rothgery* at 194.

{¶ 27} Article I, Section 10 has a similar structure: it has both a substantive-right-to-counsel part ("the party accused shall be allowed to appear and defend in person and with counsel") and a timing-of-attachment part ("[i]n any trial, in any court"). In this case, our focus is on the timing of the attachment of the right to counsel. And there are clear textual differences between the attachment parts of the federal and Ohio constitutional provisions.

10

{¶ 28} "In interpreting the Ohio Constitution, we apply the original public meaning of a provision." *State ex rel. GateHouse Media Ohio Holdings II, Inc. v. Columbus Police Dept.*, 2025-Ohio-5243, ¶ 17. A provision's original public meaning is "the meaning that would have been ascribed to it by a competent speaker of the English language at the time of its adoption." *Id.* Because "[i]t is 'our duty . . . to determine and give effect to the meaning expressed in [the Constitution's] plain language'" (ellipsis in original), *id.*, quoting *Newburgh Hts. v. State*, 2022-Ohio-1642, ¶ 17, "[t]he first consideration is always a provision's text," *id.* So, we start with the text.

{¶ 29} And here, the text cuts decisively against Morris's argument. By its terms, Article I, Section 10 guarantees a right to appear and defend with counsel "[i]n any trial, in any court." We don't ordinarily understand a preindictment police interrogation—conducted in a police interview room—to be part of a *trial* in any *court*. Nor is there any reason to think that a competent speaker of the English language at the time that Article I, Section 10 was adopted would have understood "trial" to include the kind of police interrogation at issue in this case.

{¶ 30} "Trial" has had the same ordinary meaning since at least the 18th century. In his *Commentaries on the Laws of England*—an important and influential treatise well known in Ohio by 1851—William Blackstone described a trial as a procedure where "the truth of the matters alleged must be solemnly examined and established by proper evidence in the channel prescribed by law." 3 William Blackstone, *Commentaries on the Laws of England*, 324 (Chitty Ed. 1827). And his thorough descriptions of the various methods of trial in England show that it was generally understood that all trials required the presentation of evidence for examination by a neutral decisionmaker. *See id.* at 324-385; 4 William Blackstone, *Commentaries on the Laws of England*, 342-364 (Chitty Ed. 1827). Those are the defining features of a trial as ordinarily understood today, too. *See Black's Law Dictionary* (12th Ed. 2024) (defining "trial" as "[a] formal judicial examination of

evidence and determination of legal claims in an adversary proceeding"); *see also Webster's Third New International Dictionary* (2002) (defining "trial" as "the formal examination of the matter in issue in a cause before a competent tribunal for the purpose of determining such issue: the mode of determining a question of fact in a court of law"). Nineteenth-century dictionaries from before, after, and around the time of the 1851 adoption of Article I, Section 10 are all in agreement. *See, e.g., Tomlin's Law Dictionary* (1820) (defining "trial" as "[t]he examination of a cause civil or criminal before a judge who has jurisdiction over it, according to the laws of the land"); *Burrill's Law Dictionary* (1859) (defining "trial" as "the examination before a competent tribunal, according to the laws of the land, of the facts put in issue in a cause, for the purpose of determining such issue"); *Abbott's Law Dictionary* (1879) (defining "trial" as "the examination of a cause, civil or criminal, before a judge who has jurisdiction over it, according to the laws of the land"). There is no evidence that the ordinary meaning of "trial" has changed since the 18th century. From Blackstone to *Black's*, a trial requires the presentation of evidence to a neutral decisionmaker.

{¶ 31} Morris's interrogation by Detectives Gleckler and Bender was not a trial under this longstanding ordinary meaning. Rather than *presenting* evidence, the detectives were *acquiring* evidence from Morris. And there was no neutral decisionmaker in the room, let alone one that was examining the facts of the case. Thus, a voter who approved the 1851 Constitution would not have understood the Article I, Section 10 right to counsel to apply to the police interrogation at issue in this case.

{¶ 32} Indeed, it is unlikely that an 1851 Ohio voter would have even understood the broader Sixth Amendment right to apply to the preindictment interrogation in this case. There is "strong evidence" from the time the Sixth Amendment was ratified through the end of the 19th century "that the term 'criminal prosecutio[n]' in the Sixth Amendment refers to the commencement of a

criminal suit by filing formal charges in a court with jurisdiction to try and punish the defendant." (First bracketed text in original.) *Rothgery*, 554 U.S. at 223 (Thomas, J., dissenting). That is, a prosecution didn't commence until "a formal charging document—an indictment, presentment, or information"—was filed in court. *Id.* at 221 (Thomas, J., dissenting). So, Ohio voters in 1851 would not have understood either the federal or Ohio rights to counsel to have attached before or during a police interrogation—such as the one in this case—that occurred before any formal document like an indictment had been filed in court.

{¶ 33} Our conclusion about the meaning of the Ohio provision is in accord with how we have previously interpreted the "[i]n any trial, in any court" language in Article I, Section 10. Nearly 100 years ago, in *Thomas v. Mills*, 117 Ohio St. 114, 117-120 (1927), this court considered whether a prison warden violated a prisoner's Article I, Section 10 right to counsel by denying him a private interview with his lawyer during his direct appeal. In deciding that case, we first acknowledged that the prisoner's right to counsel under Article I, Section 10, extended only to "trial." *Id.* at 119. We held that the prisoner's Article I, Section 10 right to counsel had not been violated because "the word 'trial' in criminal procedure means the proceedings in open court after the pleadings are finished and the prosecution is otherwise ready, down to and including the rendition of the verdict; and the term 'trial' does not extend to such preliminary steps as the arraignment and giving of the pleas, nor does it comprehend a hearing in error." *Id*. In other words, the right to counsel attaches only at *trial*, under the longstanding, ordinary meaning of the word. Though the *Mills* court ultimately held that the prisoner was entitled to a private interview with his attorney under another constitutional provision, *id*. at paragraph one of the syllabus, its holding about the meaning of Article I, Section 10 is what is relevant to the issue before us.

{¶ 34} This is not to say that the protections afforded by Article I, Section 10 stop at the courtroom door. The provision guarantees the right to "appear and

defend" with counsel at trial. We think it obvious that the content of the right to *defend* with counsel at trial includes what is reasonably necessary to allow counsel to prepare a defense for trial, including a right to consult privately with a defendant in preparation for trial. *See, e.g.*, *Ford v. State*, 121 Ohio St. 292, 297 (1929) (noting that a "defendant has a right to a reasonable opportunity to consult privately with his counsel" but not explicitly stating the basis of the right). But whatever the outer limits of the right "to appear and defend . . . with counsel" afforded by Article I, Section 10, that provision guarantees a *trial* right. The preindictment police interview conducted here occurred well before the attachment of that guarantee.

{¶ 35} When Ohioans adopted Article I, Section 10 in the 1851 Constitution, a competent speaker of the English language would not have understood "trial" to include a preindictment police interrogation. We therefore hold that the right to counsel in that provision did not attach before or during the investigatory interview in this case. Detectives Gleckler and Bender therefore could not have violated Morris's right to counsel guaranteed by Article I, Section 10, and that provision cannot require the suppression of statements Morris made during his interview.

{¶ 36} One final note. Both lower courts correctly noted that Ohio courts are not bound by the United States Supreme Court's interpretation of the federal Constitution when interpreting the Ohio Constitution, *see* 2023-Ohio-4105 at ¶ 10-11, 33-34 (1st Dist.). But that does not mean that Ohio courts can engage in freewheeling interpretations of our Constitution. We remain constrained by its text. Sometimes that text expresses broader rights than those that exist under the federal Constitution. *See, e.g.*, *Bloom*, 2024-Ohio-5029, at ¶ 40-42 (holding that the open-courts right under Article I, Section 16 of the Ohio Constitution is broader than its federal counterpart under the First Amendment). But sometimes it expresses narrower ones. This is one of those cases. Regardless of what we think the Constitution *should* say, we are bound by what it *does* say.

## 2. *There was no Sixth Amendment violation*

{¶ 37} In addition to finding a violation of the Ohio Constitution, the trial court also found a violation of the United States Constitution. The trial court determined that Morris unambiguously invoked his right to counsel under the Sixth Amendment during the exchange in which he said, "Like, I can't talk to a lawyer?" The court of appeals did not reach the federal constitutional issue and instead premised its holding solely on Article I, Section 10 of the Ohio Constitution. We accepted two propositions of law challenging the trial court's conclusion on the federal Constitution.

{¶ 38} We often decline to accept and decide issues that have not been passed on by the courts of appeals. But whether we pass on an issue that is properly in front of us but not addressed below, or choose to remand, is within our discretion. *See* R.C. 2503.44 ("The supreme court *may* remand . . . to the inferior courts for further proceedings." [Emphasis added.]). Though there are often prudential reasons to remand, those prudential reasons are absent in this case. Because this court voted to accept jurisdiction over the issues, because the trial court ruled on the Sixth Amendment issue, and because we have the benefit of adversarial briefing and a complete record, we will proceed to consider the issues.

{¶ 39} While the dissent criticizes our decision to address the federal constitutional issue, the dissent's author was among the four members of this court who voted to accept all three propositions of law in this case, *see* 2024-Ohio-763. We often choose to accept fewer than all of the propositions of law that have been submitted for consideration. *See, e.g.*, 2025-Ohio-2537 (accepting 2025-0656, *Badra-Muniz v. Vinyl Carpet Serv., Inc.*, on only one of three propositions of law). But in this case, all four justices voting to accept jurisdiction voted to accept all three propositions of law, and the parties prepared their briefs accordingly.

{¶ 40} Despite having voted to accept jurisdiction over the propositions of law dealing with the federal constitutional issue, the dissent now argues that the

Ohio Constitution precludes us from exercising this jurisdiction. According to the dissent, "we lack jurisdiction to consider an assignment of error or any portion of an assignment of error challenging a judgment of the court of common pleas that the court of appeals has not addressed in the first instance." Dissenting opinion, ¶ 83. This is a novel theory—so novel, in fact, that it was not proposed by any party in this litigation. Indeed, to the best that we have been able to ascertain, it is a constitutional theory so unorthodox that it has never before been advanced in our case law. And for good reason. The jurisdictional provisions relied on by the dissent refer to jurisdiction over orders and judgments (that is, cases), not individual issues. Ohio Const., art. IV, § 2(B)(2)(e); Ohio Const., art. IV, § 3(B)(2); R.C. 2501.02(C). Because the First District exercised appellate jurisdiction over the trial court's order, our review of the federal constitutional issue that was assigned as error below in no way interferes with the appellate court's jurisdiction.

{¶ 41} And while the dissent cites some cases where we have chosen to remand cases with unresolved issues to the court of appeals, it neglects to cite any of the legions of cases where we have exercised our discretion to resolve such issues in this court,[1] including opinions authored or joined by the dissenting justice, *see, e.g.*, *State v. Roberts*, 2025-Ohio-5120, ¶ 9 (resolving a manifest-weight proposition that the court of appeals determined was moot, instead of remanding the case); *State v. Carter*, 2024-Ohio-1247, ¶ 45-53 (conducting harmless-error review without remanding to the court of appeals); *State v. Bembry*, 2017-Ohio-

---

1. The United States Supreme Court also may choose to resolve issues that were not passed on by the intermediate court. *See, e.g.*, *Trump v. Slaughter*, __ U.S. __, 146 S.Ct. 18 (Sept. 22, 2025) (granting certiorari before judgment on the merits by the United States Court of Appeals for the District of Columbia Circuit, thereby causing the case to be heard in the Supreme Court without consideration by the intermediate appellate court); *Lewis v. Clarke*, 581 U.S. 155, 164, fn. 3 (2017) (considering issue that was not passed on by the Supreme Court of Connecticut but that was "fairly included in the question presented" and was "both raised to and passed on by the trial court"); *Omnicare, Inc. v. Laborers Dist. Council Constr. Industry Pension Fund*, 575 U.S. 175, 182, fn. 1 (2015) (deciding issue raised in a party's complaint but not reached by the lower courts when both parties had fully briefed the issue and the issue "played a starring role at oral argument").

8114, ¶ 10-11 (considering question under the Ohio Constitution even though it wasn't considered by the court of appeals when the appellants had raised the issue at the trial level and fully briefed the issue in the court of appeals); *see also State ex rel. Yost v. FirstEnergy Corp.*, 2024-Ohio-101, ¶ 28 ("Generally, a party may defend a judgment based on any ground that was properly preserved below."); *Univ. Hosps. of Cleveland, Inc. v. Lynch*, 2002-Ohio-3748, ¶ 52 (reviewing the merits of issues the court of appeals held to be moot).

{¶ 42} Having rejected the dissent's novel constitutional theory, we turn now to the State's two arguments about the Sixth Amendment issue. First, it argues that Morris's Sixth Amendment right never attached at all because he had not been indicted. Second, it argues that the trial court erred in concluding that he unambiguously invoked his right to counsel midway through the interrogation.

*a. Morris's federal right to counsel attached before the interrogation, but he waived it*

{¶ 43} In its second proposition of law, the State argues that Morris' Sixth Amendment right to counsel did not attach at the time of the police interview because he had not been formally charged. We can quickly dispense with this argument for two different reasons. First, under the United State Supreme Court's decision in *Rothgery*, "a criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel." 554 U.S. at 213. There is no question, then, that Morris's Sixth Amendment right to counsel attached the morning of his interrogation when he made his initial appearance and the court informed him of the charges against him, appointed him a lawyer, and set bail. And because police interrogation is a critical stage of a criminal prosecution, *Montejo*, 556 U.S. at 786, Morris had a Sixth Amendment right to have counsel present.

**{¶ 44}** Second, Morris's right to counsel during his custodial interrogation was guaranteed by "*two* sources of law." (Emphasis in original.) *Id*. at 795. It was protected not only by the Sixth Amendment, but also by the United State Supreme Court's prophylactic rules adopted in *Miranda v. Arizona*, 384 U.S. 436 (1966), to protect a defendant's Fifth Amendment right against self-incrimination. *Montejo* at 795; *see also Miranda* at 473-474. So, even if the State were correct in its argument about the attachment of Morris's Sixth Amendment right, he would still have had a right to counsel at the interrogation.

**{¶ 45}** But even though Morris had a right to counsel protected by the Fifth and Sixth Amendments, that right can be waived. "[A] defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled." *Montejo* at 786. Generally, when a defendant waives his *Miranda* rights, he also waives his Sixth Amendment right to counsel. *Id.* at 786, 795. "Since the right[s] under both [the Fifth and Sixth Amendment] [are] waived using the same procedure, doctrines ensuring voluntariness of the Fifth Amendment waiver simultaneously ensure the voluntariness of the Sixth Amendment waiver." (Citation omitted.) *Id.* at 795.

**{¶ 46}** An explicit waiver is not required. That is, a defendant can waive his *Miranda* rights (and consequently, his Sixth Amendment right to counsel) implicitly if he understands them and engages in conduct that clearly demonstrates waiver—such as by answering questions in an interrogation without his lawyer. *See North Carolina v. Butler*, 441 U.S. 369, 370-373, 376 (1979).

**{¶ 47}** Here, there is no dispute that Morris waived his federal right to counsel before the interrogation when he acknowledged understanding his *Miranda* rights and proceeded to answer the detectives' questions. Morris conceded in his memorandum in opposition to jurisdiction in this court that he "waived both his *Miranda* rights and Sixth Amendment right to counsel by proceeding to answer questions after Detective Gleckler recited his *Miranda* rights."

*b. Morris did not invoke his federal right to counsel during the interrogation*

{¶ 48} Even though Morris waived his federal right to counsel before the interrogation, he was still capable of invoking it partway through. The question is whether he did.

{¶ 49} The United States Supreme has held that when a suspect has waived his *Miranda* rights, he can only invoke his right to counsel with an "unambiguous" and "unequivocal" request for counsel. *Davis v. United States*, 512 U.S. 452, 462 (1994). Whether a suspect unambiguously and unequivocally requested counsel is an "objective inquiry." *Id*. at 459. The question is whether a reasonable police officer would have clearly understood a suspect's statement to be a request for counsel. *See id.* "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," police are not required to cease questioning. (Emphasis in original.) *Id.*

{¶ 50} In adopting its holding, the *Davis* Court recognized the need for a "bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information." *Id.* at 461. It sought to avoid the specter of police officers being "forced to make difficult judgment calls about whether [a] suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong." *Id.* The Court recognized that its bright-line rule "requiring a clear assertion of the right to counsel might disadvantage some suspects who—because of fear, intimidation, lack of linguistic skills, or a variety of other reasons—will not clearly articulate their right to counsel although they actually want to have a lawyer present." *Id.* at 460. But it concluded that the *Miranda* warnings were adequate to address these concerns.

{¶ 51} The *Davis* Court explicitly declined to adopt a rule requiring officers to ask clarifying questions if confronted with an ambiguous or equivocal request for counsel. *Id.* at 461-462. "If the suspect's statement is not an unambiguous or

unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id.*

{¶ 52} The State argues that Morris did not unambiguously and unequivocally invoke his right to counsel during the interrogation. Morris argues that he did. The trial court agreed with Morris, finding that he clearly and unambiguously invoked his right to counsel in the exchange with Detective Gleckler that started with Morris asking, "Like, I can't talk to a lawyer?" We disagree.

{¶ 53} Recall the crucial moments of the interrogation. The detectives and Morris had been discussing the February 2022 shooting for several minutes—a shooting that Morris had consistently maintained he was not involved in. As annoyance and frustration set in, Morris insisted, "It sounds like y'all are trying to put something else on me that I don't got nothing to do with." Just ten seconds later, Morris asked: "Like, I can't talk to a lawyer?" Detective Gleckler told him, "Anybody can talk to a lawyer." Morris sat silently. Detective Gleckler then repeated himself: "Anybody can talk to a lawyer."

{¶ 54} We note that there is some question as to what Morris said next. As we review the footage of the interrogation, it seems fairly clear that, with a slight head shake, Morris said: "Yeah cuz that's—you know we ain't goin' do that cuz I don't know what you talkin' 'bout."[2] Notably, however, both lower courts dropped the "ain't" from Morris's statement. *See* 2023-Ohio-4105 at ¶ 9, 12 (1st Dist.). That is, they have him saying, "[Y]eah cause that's—we goin' to do that because I don't know what you're talking about." *Id.* at ¶ 12. We think it is more likely that

---

2. Oddly, the dissent criticizes us for resolving a factual dispute that it says is not properly in front of us. Dissenting opinion at ¶ 108. But of course, we do nothing of the sort. We credit the trial court's interpretation of the video but conclude that even under the trial court's construction of Morris's statement, it did not represent an unambiguous request for counsel.

Morris said, "Yeah cuz that's—you know we *ain't* goin' do that cuz I don't know what you talkin' 'bout." (Emphasis added.)

{¶ 55} We assume, however, for purposes of our review, that the trial court was right about what Morris said. But, even crediting this understanding, Morris's statement was not an unambiguous and unequivocal request for counsel. Consider the context. The detectives and Morris had been talking for 45 minutes before the key ten-second exchange. During those 45 minutes, Morris calmly confessed to a shooting that resulted in four felonious-assault charges. After a long stretch of cooperation, they began discussing Morris's gun and a shooting connected to the weapon that Morris insisted he never participated in. Suddenly, Morris asked, "Like, I can't talk to a lawyer?" Detective Gleckler correctly noted that anybody could. Then, according to the lower courts, Morris responded, "[Y]eah cause that's—we goin' to do that because I don't know what you're talking about." 2023-Ohio-4105 at ¶ 12 (1st Dist.).

{¶ 56} That response is both ambiguous and equivocal. It's not clear what "that" is or when they are "goin' to do" it. "[T]hat" *could* have referred to talking to a lawyer. But again, Morris could also have been referring to the broader context where he insisted that the detectives were trying to pin a shooting on him that he had nothing to do with—*that* could be what he was saying they were going to do. The end of his statement—"because I don't know what you're talking about"— makes that possibility more probable. That is, in full context Morris *could* have been saying that, since he didn't know what they were talking about, it looked like they were going to pin a shooting on him that he didn't do. The point is that the statement is ambiguous.

{¶ 57} Further, regardless of what "that" refers to, it's not clear *when* they are going to do it. When someone says that he is *going to* do something, that generally means that he will do it in the future. So, even if it were absolutely clear that Morris used "that" to refer to talking to a lawyer, he implied that he was going

to do it at some point in the future rather than presently. Thus, he may have meant that he was going to talk to a lawyer in the future because he was not going to let them pin a shooting on him that he didn't do.

{¶ 58} Morris's reference to "that" was more ambiguous than other statements that this court and other courts have found too ambiguous to require questioning to cease. *See, e.g.*, *State v. Brown*, 2003-Ohio-5059, ¶ 19 ("[D]on't I supposed to have a lawyer present[?]"); *State v. Henness*, 1997-Ohio-405, ¶ 54 ("I think I need a lawyer . . ." [ellipsis in original]); *Davis*, 512 U.S. at 462 ("Maybe I should talk to a lawyer"); *United States v. Mohr*, 772 F.3d 1143, 1146 (8th Cir. 2014) ("I think I should get [a lawyer]" [bracketed text in original]); *United States v. Carrillo*, 660 F.3d 914, 923 (5th Cir. 2011) ("I just man, I'm not gonna lie to you I wish I had a lawyer right here knowing that you know it's gonna I mean I'm gonna work with y'all I'm telling you I'm gonna tell you everything."); *State v. Moore*, 311 Kan. 1019, 1035-1036 (2020) ("Well, I guess it's lawyer time now then 'cause I don't know what . . . she's got going on . . . .").

{¶ 59} Other courts have also found that statements, like Morris's, that imply a future rather than present desire to talk to a lawyer to be too equivocal to satisfy the *Davis* standard. *See, e.g.*, *Kirby v. State*, 304 Ga. 472, 475 (2018) ("I'm going to go ahead and get a lawyer"); *Commonwealth v. Durand*, 475 Mass. 657, 666 (2016) ("I am going to have to get a lawyer."); *Baker v. State*, 363 Ark. 339, 345 (2005) ("I think I'm going to need [a lawyer]."). All that is to say, the lower courts' version of Morris's statement was neither unambiguous nor unequivocal under *Davis*.

{¶ 60} The trial court was correct to look beyond individual statements in determining whether Morris unambiguously and unequivocally invoked his right to counsel. But it didn't go far enough. It examined only a ten-second blip in a two-hour interrogation, ignoring the 45 minutes of context that came before it. The full context is necessary. And the test is not whether an officer could possibly consider

Morris's statement as evincing a desire for a lawyer. The test is whether a reasonable officer, under the totality of the circumstances, would have understood Morris's statement to be an unambiguous and unequivocal request for a lawyer in that moment. *Davis*, 512 U.S. at 459.

{¶ 61} Rather than focus on what a reasonable police officer would have understood based on the totality of the circumstances, the dissent insists that the statement "like I can't talk to a lawyer?" was by itself sufficient to invoke the right to counsel regardless of the surrounding context, dissenting opinion at ¶ 136. *But see Obershaw v. Lanman*, 453 F.3d 56, 64-65 (1st Cir. 2006) (concluding that suspect's statement "Can I talk to a lawyer first?" was not an unambiguous invocation of the right to counsel because it was an "inquir[y] whether he could talk to a lawyer, rather than [an] express[] assert[ion] that he in fact wanted to do so"). In doing so, the dissent goes astray of the Supreme Court's admonition that the inquiry should be based on what a reasonable officer would have understood "in light of the circumstances" and that if a reasonable officer would have understood "only that the suspect *might* be invoking the right to counsel," the cessation of questioning is not required. (Emphasis in original.) *Davis* at 452.

{¶ 62} Because Morris did not unambiguously and unequivocally invoke his right to counsel, Detectives Gleckler and Bender were not required to stop the interrogation or clarify what Morris meant. They therefore did not violate his right to counsel by continuing. Thus, the trial court was incorrect to hold that the Sixth Amendment required the suppression of all statements Morris made after the 45-minute mark of the interrogation. The federal Constitution does not require the suppression of any of the statements he made during the interrogation.

### III. CONCLUSION

{¶ 63} Neither the Ohio nor the federal Constitution provided a basis to grant Morris's motion to suppress the statements he made to police during his interrogation. Both the trial court and the First District Court of Appeals erred by

holding otherwise. We reverse the First District's judgment and remand this case to the trial court with instructions to vacate its order granting Morris's motion to suppress and proceed accordingly.

Judgment reversed

and cause remanded.

_____

**KENNEDY, C.J., joined by LANZINGER, J., and by BRUNNER, J., except for Part II, dissenting.**

{¶ 64} I agree with the majority that appellee Isaiah Morris's right to counsel under the Ohio Constitution had not attached at the time law enforcement *initiated* his interrogation. Therefore, the majority's reversal of the judgment of the First District Court of Appeals, which affirmed the suppression of Morris's statements based on its faulty reading of the Ohio Constitution, is correct. I disagree, however, with the majority's decision to accept appellant the State of Ohio's invitation to address its third proposition of law, which concerns whether Morris unambiguously and unequivocally invoked his right to counsel under the Sixth Amendment to the United States Constitution *during* his interrogation. The appellate court did not resolve that question of law in the first instance when it was before that court as the fourth issue raised by the State in support of its assignment of error challenging the suppression order of the common pleas court.

{¶ 65} This court became a court of last resort in 1851 following the ratification and adoption of Ohio's current Constitution, which created a system of intermediate appellate courts. Under amendments approved following Ohio's 1912 Constitutional Convention, only the intermediate courts of appeals have original appellate jurisdiction over final orders or judgments of courts of record, which include the courts of common pleas. And it is still true today that except for death-penalty cases, only the district courts of appeals retain original appellate jurisdiction to rule on assignments of error challenging judgments and final orders of the trial

courts. Because this court has no constitutional authority outside death-penalty cases to resolve an assignment of error on direct appeal from a court of common pleas in the first instance, I would decline the State's invitation to address its third proposition of law. Therefore, having reversed the judgment of the appellate court on the third issue presented under the State's assignment of error, which the First District did resolve—i.e., whether Morris's right to counsel under the Ohio Constitution attached at the time law enforcement initiated the interrogation—this court should remand this matter to the appellate court for it to address in the first instance the fourth issue raised in that court under the State's assignment of error challenging the judgment of the court of common pleas.

{¶ 66} I also disagree with the majority's dubious creation of an alleged issue of fact. In its brief in opposition to Morris's motion to suppress, the State limited its argument to the assertion that Morris's question, "I can't talk to a lawyer?," was not an unambiguous and unequivocal request for counsel. It did not argue that Morris's subsequent statements disclaimed or otherwise failed to invoke his right to counsel. Then, in the assignment of error it asserted in the First District, the State did not challenge the trial court's finding of fact that after being told that he could talk to a lawyer, Morris said, "[Y]eah, cause that's, we goin' to do that cause I don't know what you are talking about." And in its brief to this court, the State again has essentially agreed with the trial court's determination of what Morris said.

{¶ 67} Even though the majority has decided to don the robes of the court-of-appeals judges to decide an unresolved portion of the State's assignment of error in the first instance, it is nonetheless bound by the facts as presented by the parties. It is curious, then, that the majority would manufacture a question of fact (whether Morris actually said he was *not* going to speak to a lawyer) while allegedly accepting the trial court's interpretation of what Morris said (that Morris said he *was* going to speak to a lawyer) to decide the unresolved portion of the assignment

of error. If the majority were relying on the trial court's determination, why would it raise a nonexistent question of fact?

{¶ 68} It is my fundamental belief that this court should exercise the judicial restraint required by the Ohio Constitution and remand this case to the court of appeals for it to exercise its original appellate jurisdiction to review fully the judgment of the common pleas court in the first instance. But because the majority fails to adhere to constitutional constraints, I am compelled to address its determination that Morris did not unambiguously and unequivocally invoke his right to counsel under the Sixth Amendment. *See* majority opinion, ¶ 59. After objectively reviewing Morris's statement in its context and in light of the reasonable-police-officer standard, I would conclude that Morris did unambiguously and unequivocally invoke his Sixth Amendment right to counsel *during* the interrogation. Because the majority holds otherwise, I dissent.

## I. Article I, Section 10 of the Ohio Constitution Does Not Apply

{¶ 69} Morris moved to suppress statements he made during his interrogation, which took place after he made his initial appearance and was appointed counsel. The trial court suppressed those statements, concluding that police detectives violated Morris's right to counsel under both Article I, Section 10 of the Ohio Constitution and the Sixth Amendment to the United States Constitution.

{¶ 70} The State appealed the trial court's suppression order, asserting one assignment of error—i.e., "The trial court erred as a matter of law when it granted [Morris's] motion to suppress statements." In support of that assignment of error, the State set forth four "issue[s] presented for review and argument." The State's third issue asserted, "Courts must be cautious and conservative when asked to expand constitutional rights under the Ohio Constitution. This Court is urged to follow Ohio's Fifth District and rule that *Montejo* [*v. Louisiana*, 556 U.S. 778 (2009)] applies to Ohio's Constitution." The State's fourth issue asserted, "A

suspect must unambiguously request counsel, meaning a suspect must articulate a desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."

{¶ 71} The First District affirmed the trial court's judgment but did so only under Article I, Section 10 of the Ohio Constitution. 2023-Ohio-4105, ¶ 1 (1st Dist.). The appellate court declined to address the State's challenge to the portion of the trial court's order suppressing Morris's statements on the basis that he unambiguously and unequivocally invoked his right to counsel under the Sixth Amendment during the interrogation. *Id.* at ¶ 56. It reasoned that it was unnecessary to reach that issue because all of Morris's statements had been suppressed under the Ohio Constitution. *Id.*

{¶ 72} In reaching its decision, the court of appeals first determined that it was not bound by the United States Supreme Court's Sixth Amendment precedent and that the Ohio Constitution provided greater right-to-counsel protection than the Sixth Amendment. *Id.* at ¶ 33-34, 36. It then explained that "Ohio's policies protecting the attorney-client relationship and discouraging unlawful police conduct" supported applying the bright-line rule announced by the United States Supreme Court in *Michigan v. Jackson*, 475 U.S. 625 (1986), even though the Court later overruled *Jackson* in *Montejo.* 2023-Ohio-4105 at ¶ 49 (1st Dist.). Accordingly, the First District held that under Article I, Section 10 of the Ohio Constitution, "when an accused's right to counsel has attached and an attorney has been secured, any uncounseled waiver of the defendant's right to counsel in a state-initiated interrogation is deemed invalid." *Id.* at ¶ 55.

{¶ 73} I agree with the majority that the right to counsel under the Ohio Constitution did not attach in these circumstances. Having reversed the First District's judgment on a question it did resolve, this court should remand this matter to the First District for it to resolve the State's fourth issue, which the First District

declined to address in the first instance. Instead, the majority usurps the constitutional authority of the judges of the First District, improperly purporting to revert this court's appellate jurisdiction to the time of Ohio's 1802 Constitution.

## II. Appellate Jurisdiction of the Supreme Court of Ohio

{¶ 74} "The Ohio Constitution gives us limited power." *State ex rel. Martens v. Findlay Mun. Court*, 2024-Ohio-5667, ¶ 10. The majority's rush to decide in the first instance the fourth issue that the State asserted in support of its assignment of error runs roughshod over this fundamental precept of our judicial system and stretches this court's original appellate jurisdiction beyond constitutional bounds. It is ironic that the majority does this so soon after we decided *Martens*, in which we overruled *State ex rel. Ohio Academy of Trial Lawyers v. Sheward*, 1999-Ohio-123, the posterchild for constitutional overreach by this court.

### A. Constitutional Authority of Appellate Courts in Ohio

{¶ 75} As the first State admitted to the Union from the Northwest Territory under the Enabling Act of 1802, *see* Ohio History Connection, https://www.ohiohistory.org/ohio-the-48th-state/ (accessed Mar. 3, 2026) [https://perma.cc/SG62-BSGX], Ohio adopted a constitution in 1802 that vested the judicial powers of the State, "both as to matters of law and equity," in the Supreme Court, courts of common pleas, justices of the peace, and such other courts as the legislature might establish, 1802 Ohio Const., art. III, § 1. At that time, this court had "original and appellate jurisdiction, both in common law and chancery, in such cases as shall be directed by law," *id.* at § 2, with "exclusive jurisdiction in the trial of divorce, alimony and capital cases," Skeel, *Constitutional History of Ohio Appellate Courts*, 6 Clev.St.L.Rev. 323, 324 (1957). The court also shared criminal jurisdiction with the courts of common pleas "as may be pointed out by law." 1802 Ohio Const., art. III, § 4.

28

{¶ 76} With the adoption of the 1851 Ohio Constitution, the judicial system changed. Skeel at 324. And upon ratification, this court's original appellate jurisdiction changed dramatically. The State's judicial powers were vested in the Supreme Court, newly created "district courts," common pleas courts, probate courts, justices of the peace, and "such other courts, inferior to the supreme court . . . as the General Assembly, may, from time to time establish." 1851 Ohio Const., art. IV, § 1. Moreover, when the 1851 Constitution was ratified, the Supreme Court was divested of most of its original jurisdiction, except for the extraordinary writs of quo warranto, mandamus, habeas corpus, and procedendo. 1851 Ohio Const., art IV, § 2. The Supreme Court was also provided with "such appellate jurisdiction as may be provided by law." *Id*.

{¶ 77} The district courts, like the Supreme Court, had original jurisdiction in quo warranto, mandamus, habeas corpus, and procedendo and "such appellate jurisdiction as may be provided by law." *Id*. at § 6. Although the district courts' appellate jurisdiction was "defined as the same as that of the Supreme Court," with their "place in the judicial system . . . inferior to that of the Supreme Court," the district courts were Ohio's "first attempt . . . to create an intermediate reviewing court." Skeel, 6 Clev.St.L.Rev. at 325. It was then that the Supreme Court of Ohio, like the United States Supreme Court, became a court of last resort—"a court of review, not of first view," *Cutter v. Wilkinson*, 544 U.S. 709, 718, fn. 7 (2005).

{¶ 78} With amendments made to Article IV of the Ohio Constitution in 1883, the district courts gave way to "circuit courts," 1851 Ohio Const., art. IV, § 1 (effective from Oct. 9, 1883, to Jan. 1, 1913); *see also* Skeel at 327. The circuit courts had "appellate jurisdiction as may be provided by law," 1851 Ohio Const., art. IV, § 6 (effective from Oct. 9, 1883, to Jan. 1, 1913), which included original appellate jurisdiction over certain "judgments or final orders" from the common pleas courts in cases without a right to a jury as well as "final orders or judgments" of the common pleas courts "for errors appearing on the face of the record," Skeel

at 327, citing R.S. 5226 and 6709.  The amendments also granted the Supreme Court "appellate jurisdiction as may be provided by law."  1851 Ohio Const., art. IV, § 2 (effective from Oct. 9, 1883, to Jan. 1, 1913).

{¶ 79} Following the 1912 Constitutional Convention, the judicial system was reorganized through additional amendments to Article IV.  The judicial power of the State was "vested in a supreme court, courts of appeals, courts of common pleas, courts of probate, and such other courts inferior to the courts of appeals as may from time to time be established by law."  1851 Ohio Const., art. IV, § 1 (effective from Jan. 1, 1913, to May 7, 1968).  The same amendment also conferred on the Supreme Court original jurisdiction over extraordinary writs and "appellate jurisdiction in all cases involving questions arising under the constitution of the United States or of this state, in cases of felony on leave first obtained, and in cases which originated in the court of appeals, and such revisory jurisdiction of the proceedings of administrative officers as may be conferred by law."  1851 Ohio Const., art. IV, § 2 (effective from Jan. 1, 1913, to Nov. 7, 1944).  Moreover, "[i]n cases of public or great general interest," the Supreme Court could "direct any court of appeals to certify its record to the supreme court, and [could] review and affirm, modify or reverse the judgment of the court of appeals."  *Id*.

{¶ 80} The courts of appeals retained the same original jurisdiction over extraordinary writs as the circuit courts had possessed and were endowed with "appellate jurisdiction in the trial of chancery cases, and, to review, affirm, modify, or reverse the judgments of the courts of common pleas, superior courts and other courts of record within the district as may be provided by law."  1851 Ohio Const., art. IV, § 6 (effective from Jan. 1, 1913, to Jan. 1, 1945).  Judgments of the courts of appeals were final in all cases "except cases involving questions arising under the constitution of the United States or of this state, cases of felony, cases of which it has original jurisdiction, and cases of public or great general interest in which the supreme court may direct any court of appeals to certify its record to that court."

*Id.* Article IV, Section 6 also provided that "whenever the judges of a court of appeals find that a judgment upon which they have agreed is in conflict with a judgment pronounced upon the same question by any other court of appeals of the state, the judges shall certify the record of the case to the supreme court for review and final determination." *Id.*

{¶ 81} The Modern Courts Amendment of 1968 provided the Supreme Court with appellate jurisdiction over appeals from the courts of appeals in cases in which the death penalty was affirmed, cases involving constitutional questions, cases involving felonies on leave first obtained, and cases of public or great general interest as well as certified conflicts from the courts of appeals. 1851 Ohio Const., art. IV, § 2(B)(2) (effective from May 7, 1968, to Jan. 1, 1995). And it preserved the Supreme Court's original appellate jurisdiction over appeals from actions originating in the courts of appeals and over appeals from certain state agencies when conferred by law. 1851 Ohio Const., art. IV, § 2(B)(2)(a)(i) and (c) (effective from May 7, 1968, to Jan. 1, 1995). The Modern Courts Amendment also solidified the court's authority to superintend the judicial system in Ohio and provided for the promulgation of rules of practice and procedure. 1851 Ohio Const., art. IV, § 5 (effective from May 7, 1968, to Nov. 6, 1973); *see also* Steinglass & Scarselli, *The Ohio State Constitution*, 290, 308-309 (2d Ed. 2022). What the Modern Courts Amendment did not do, however, was grant this court original appellate jurisdiction to consider assignments of error in direct appeals from judgments of the common pleas courts.

{¶ 82} In 1995, the people of Ohio expanded the original appellate jurisdiction of the Supreme Court to include direct appeals of judgments imposing the death penalty, and Ohioans also deprived the courts of appeals of jurisdiction over direct appeals in those cases. 1851 Ohio Const., art. IV, § 2(B)(2)(c) and 3(B)(2) (effective Jan. 1, 1995). The people of Ohio therefore knew how to grant

31

this court original appellate jurisdiction over decisions of the common pleas courts, but for nearly all cases originating in the courts of common pleas, they did not.

{¶ 83} As a review of the history of our Constitution shows, the courts of appeals—not this court—have original appellate jurisdiction to review assignments of error challenging judgments and final orders of the common pleas courts not involving the imposition of the death penalty. The Supreme Court does not have original appellate jurisdiction to review decisions of the courts of common pleas on direct appeal, except in death-penalty cases. It follows, then, that we lack jurisdiction to consider an assignment of error or any portion of an assignment of error challenging a judgment of the court of common pleas that the court of appeals has not addressed in the first instance. Otherwise, we would essentially be reviewing the judgment or final order of the court of common pleas on direct appeal. We lack constitutional authority to do that.

{¶ 84} Given the constitutional boundaries of this court's original appellate jurisdiction relative to those of the courts of appeals, it is incumbent on the First District—not this court—to resolve in the first instance the fourth issue the State raised in support of its assignment of error presented below—i.e., did Morris invoke his right to counsel *during* the interrogation? After all, remanding a matter to the appellate court for it to address an unresolved assignment of error is not only required but is also commonplace when this court reverses the judgment of an appellate court and there is an unresolved assignment of error. *See, e.g., State v. Coker*, 2025-Ohio-2051, ¶ 2; *Ohio Council 8, AFSCME, AFL-CIO v. Lakewood*, 2025-Ohio-2052, ¶ 2; *State v. Smith*, 2024-Ohio-5745, ¶ 1; *In re R.G.M.*, 2024-Ohio-2737, ¶ 2; *State v. Williams*, 2024-Ohio-1433, ¶ 1; *State v. Dudas*, 2024-Ohio-775, ¶ 21; *State v. Brown*, 2024-Ohio-749, ¶ 38; *Everhart v. Coshocton Cty. Mem. Hosp.*, 2023-Ohio-4670, ¶ 33; *State ex rel. Internatl. Assn. of Fire Fighters, Local 1536, AFL-CIO v. Sakacs*, 2023-Ohio-2976, ¶ 1; *State v. Stalder*, 2023-Ohio-2359, ¶ 6; *Marchbanks v. Ice House Ventures, L.L.C.*, 2023-Ohio-1866, ¶ 21; *In re*

*Adoption of H.P.*, 2022-Ohio-4369, ¶ 4; *State v. Brown*, 2022-Ohio-4347, ¶ 33; *State v. Bond*, 2022-Ohio-4150, ¶ 38; *Goudy v. Tuscarawas Cty. Pub. Defender*, 2022-Ohio-4121, ¶ 3; *In re K.K.*, 2022-Ohio-3888, ¶ 11; *Ostanek v. Ostanek*, 2021-Ohio-2319, ¶ 6; *State v. Gideon*, 2020-Ohio-6961, ¶ 30; *State v. Fazenbaker*, 2020-Ohio-6731, ¶ 15; *In re R.B.*, 2020-Ohio-5476, ¶ 49; *Moore v. Mt. Carmel Health Sys.*, 2020-Ohio-4113, ¶ 37; *Jones v. Cleveland Clinic Found.*, 2020-Ohio-3780, ¶ 39; *State v. Smith*, 2020-Ohio-3747, ¶ 1; *State v. Dangler*, 2020-Ohio-2765, ¶ 26; *State v. Christian*, 2020-Ohio-828, ¶ 29; *State v. Gwynne*, 2019-Ohio-4761, ¶ 2; *Gembarski v. PartsSource, Inc.*, 2019-Ohio-3231, ¶ 5; *State v. Ireland*, 2018-Ohio-4494, ¶ 1; *State v. Jackson*, 2018-Ohio-2169, ¶ 31; *Giancola v. Azem*, 2018-Ohio-1694, ¶ 22; *State v. Gordon*, 2018-Ohio-259, ¶ 30; *State v. Mohamed*, 2017-Ohio-7468, ¶ 30.

{¶ 85} The majority relies on R.C. 2503.44 as statutory authority for the proposition that this court may *remand cases to inferior courts*. Majority opinion at ¶ 38. What that statute does not do, however, is give this court permission to review the judgments of common pleas courts. Nor could it. "'It is a well-established principle of constitutional law that when the jurisdiction of a particular court is constitutionally defined, the legislature cannot by statute restrict or enlarge that jurisdiction unless authorized to do so by the constitution.'" *ProgressOhio.org v. Kasich*, 2011-Ohio-4101, ¶ 3, quoting *Smith v. State*, 289 N.C. 303, 328 (1976). Importantly, "our jurisdiction is provided directly by the Constitution itself." *State ex rel. Ctr. for Media & Democracy v. Yost*, 2024-Ohio-2786, ¶ 15, citing *State v. Jones*, 2024-Ohio-2719, ¶ 25-28 (Kennedy, C.J., concurring in judgment only).

{¶ 86} Article IV, Section 2(B)(2) of the Ohio Constitution establishes the appellate jurisdiction of this court. And with only one exception—i.e., appeals from "the proceedings of administrative officers or agencies," Ohio Const., art. IV, § 2(B)(2)(d)—the General Assembly cannot abridge, enlarge, or modify the appellate jurisdiction granted to this court by the Ohio Constitution. *See Jones* at

¶ 28 (Kennedy, C.J., concurring in judgment only).  If R.C. 2503.44 permitted this court to entertain an appeal from the common pleas court in this case—and it does not—the statute would conflict with the plain language of the Ohio Constitution. The majority's reliance on R.C. 2503.44 is therefore misplaced.

{¶ 87} By accepting the State's invitation to address its third proposition of law, the majority reviews the fourth issue that the State raised in support of its assignment of error and that was not resolved by the court of appeals.  In my view, by doing so, the majority oversteps the constitutional limit on this court's original appellate jurisdiction and usurps the original appellate jurisdiction of the court of appeals.  *See* Ohio Const., art. IV, § (3)(B)(2); R.C. 2501.02(C); R.C. 2953.02.  The people of Ohio established the appellate jurisdiction of this court, and the people— through constitutional amendments and by acting through the General Assembly— established the appellate jurisdiction of the courts of appeals.  This court should respect those distinct boundaries.  The majority's reaching to decide the State's third proposition of law, knowing that the court of appeals did not address the State's fourth issue below, purports to revert this court's original appellate jurisdiction to the time of the 1802 Ohio Constitution, when this court had original appellate jurisdiction over decisions of the trial courts.

{¶ 88} As explained below, the majority offers a reason for usurping the original appellate jurisdiction of the First District.  It says that the United States Supreme Court does it, so it is therefore appropriate for this court to do the same now.

### B.  A Procedural Practice or Rule of the United States Supreme Court Does Not Reflect the Powers Enumerated in the Ohio Constitution

{¶ 89} This court, like the United States Supreme Court, is a court of last resort.  As such, we should be "mindful that we are a court of review, not of first view." *Cutter*, 544 U.S. at 718, fn. 7.  And like the Supreme Court in *Cutter*, which declined to hear the respondents' arguments that were "not addressed by the [Sixth

Circuit] Court of Appeals," *id*., the majority should decline the State's invitation to address its third proposition of law, because the First District did not address the issue below, where it was raised by the State as the fourth issue in support of its assignment of error. *See* 2023-Ohio-4105 at ¶ 56 (1st Dist.).

{¶ 90} The majority suggests that the United States Supreme Court frequently decides issues that have not been addressed in the first instance by the intermediate appellate courts below. Majority opinion at ¶ 41, fn. 1. To be sure, the Supreme Court's sentiment that it is "'a court of review, not of first view,'" has recently been called into question. *See* Vladeck, *A Court of First View*, 138 Harv.L.Rev. 533, 574 (2024), quoting *Cutter* at 718, fn. 7. And though I recognize that the Court has recently decided an increasing number of cases without waiting for intermediate appellate review, *id.* at 537-538, there is a difference between those cases—which often involve applications for emergency relief, matters of imperative public importance, and appeals from preliminary injunctions, *id*. at 536-537, 544—and conventional appeals like the one in this case. When resolving cases in the traditional appellate process, the Supreme Court routinely declines to reach issues not decided by the lower courts. *See*, *e.g.*, *Johnson v. Arteaga-Martinez*, 596 U.S. 573, 583-584 (2022); *Moody v. NetChoice, L.L.C.*, 603 U.S. 707, 726 (2024); *Jack Daniel's Properties, Inc. v. VIP Prods., L.L.C.*, 599 U.S. 140, 161 (2023); *Glacier Northwest, Inc. v. Internatl. Bhd. of Teamsters Local Union No. 174*, 598 U.S. 771, 784, fn. 3 (2023); *Siegel v. Fitzgerald*, 596 U.S. 464, 480-481 (2022); *United States v. Haymond*, 588 U.S. 634, 657 (2019); *PDR Network, L.L.C. v. Carlton & Harris Chiropractic, Inc.*, 588 U.S. 1, 8 (2019); *Upper Skagit Indian Tribe v. Lundgren*, 584 U.S. 554, 560-561 (2018); *Jennings v. Rodriguez*, 583 U.S. 281, 312 (2018); *Brownback v. King*, 592 U.S. 209, 215, fn. 4 (2021); *Andrus v. Texas*, 590 U.S. 806, 824 (2020); *Retirement Plans Commt. of IBM v. Jander*, 589 U.S. 49, 52 (2020); *McWilliams v. Dunn*, 582 U.S. 183, 200 (2017); *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 441, fn. 4 (2017); *BNSF Ry. Co.*

*v. Tyrrell*, 581 U.S. 402, 415 (2017); *McLane Co., Inc. v. Equal Emp. Opportunity Comm.*, 581 U.S. 72, 85 (2017); *Manuel v. Joliet*, 580 U.S. 357, 372-373 (2017); *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 913 (2014); *Jefferson v. Upton*, 560 U.S. 284, 294 (2010); *Arkansas Game & Fish Comm. v. United States*, 568 U.S. 23, 37-38 (2012); *Skinner v. Switzer*, 562 U.S. 521, 537 (2011); *Christian Legal Soc. Chapter of the Univ. of California, Hastings College of the Law v. Martinez*, 561 U.S. 661, 697, fn. 28 (2010); *Fed. Communications Comm. v. Fox Television Stations, Inc.*, 556 U.S. 502, 529 (2009).

{¶ 91} The majority identifies a few cases in which the United States Supreme Court reached an issue without awaiting lower-court consideration, *see* majority opinion at ¶ 41, fn. 1, but those cases are outliers. Notably, in one of those cases, *Lewis v. Clarke*, 581 U.S. 155, 164, fn. 3 (2017), the Supreme Court pointed out that the unconsidered issue was "an integral part of [the respondent's] sovereign immunity argument"; in contrast, here, the State's third proposition of law—relating to the Sixth Amendment to the United States Constitution—presents an issue and argument that is wholly different from the dispositive issue grounded in the Ohio Constitution. And in another case cited by the majority, *Omnicare, Inc. v. Laborers Dist. Council Constr. Industry Pension Fund*, 575 U.S. 175, 182, fn. 1 (2015), the unconsidered issue was "the crux of the parties' dispute before [the Supreme] Court."

{¶ 92} Another one of the cases that the majority cites is *Trump v. Slaughter*, __ U.S. __, 146 S.Ct. 18 (Sept. 22, 2025), in which the Supreme Court passed over the federal court of appeals to hear on the merits a case that had arisen in a federal district court. While not cited in *Slaughter* or relied on by the majority here, Rule 11 of the Rules of the Supreme Court of the United States grants the Supreme Court authority to review a federal-district-court decision without waiting for a judgment from the intermediate appellate court when "the case is of such imperative public importance as to justify deviation from normal appellate practice

and to require immediate determination." But Rule 11 does not apply to this court, and Ohio does not have a rule like it. And even if Ohio had its own version of Rule 11, this case is not of such imperative public importance as to justify immediate consideration of an issue not decided below. Moreover, if any such rule were adopted in Ohio, it would be without effect, because no procedural rule or rule of practice can abridge, enlarge, or modify this court's original appellate jurisdiction under the Ohio Constitution. *See* Ohio Const., art. IV, § 5(B) ("The Supreme court shall prescribe rules governing practice and procedure in all courts of the state, which rules shall not abridge, enlarge, or modify any substantive right."). So, regardless of whether the United States Supreme Court has the authority to leapfrog the intermediate appellate courts to decide cases directly from the trial courts, this court does not. For most cases, review of a common-pleas-court decision must first pass through the respective court of appeals; we have no authority to short-circuit the constitutionally mandated process.

{¶ 93} The majority points to opinions in which this court nonetheless has decided issues that were raised in assignments of error but not first passed upon by the court of appeals—including *State v. Roberts*, 2025-Ohio-5120, which I authored. Upon further research and reflection, I am convinced that this court cannot make an end run around the limits of our appellate jurisdiction by reviewing a trial-court judgment under the guise of resolving "individual issues," majority opinion at ¶ 40, that have not been passed upon by the court of appeals. As Justice Antonin Scalia once noted about the United States Supreme Court, "[a]s far as I am aware, the public is not under the illusion that we are infallible. I see little harm in admitting that we made a mistake . . . ." *Dickerson v. United States*, 530 U.S. 428, 464 (2000) (Scalia, J., dissenting).

{¶ 94} Additionally, the majority insinuates that my discussion of the limits of our appellate jurisdiction is improper because no party has raised the issue. *See*

majority opinion at ¶ 40. That begs the question of what the party-presentation principle is and whether it applies to this case.

### C. The Party-Presentation Principle

{¶ 95} Our adversarial system of adjudication depends on the party-presentation principle—the idea that "'we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.'" *Snyder v. Old World Classics, L.L.C.*, 2025-Ohio-1875, ¶ 4, quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). The basic premise is that "'[parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.'" (Bracketed text in original.) *United States v. Sineneng-Smith*, 590 U.S. 371, 375-376 (2020), quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment). For this reason, "[o]ur longstanding policy is not to address an unbriefed issue." *State ex rel. Parisi v. Dayton Bar Assn. Certified Grievance Commt.*, 2019-Ohio-5157, ¶ 34 (Kennedy, J., concurring in part and concurring in judgment only in part) (collecting cases). Nonetheless, the party-presentation principle is not absolute, and this court has observed that there are exceptions to it. *State ex rel. GateHouse Media Ohio Holdings II, Inc. v. Columbus Police Dept.*, 2025-Ohio-5243, ¶ 41; *see also* Frost, *The Limits of Advocacy*, 59 Duke L.J. 447, 461-467 (2009) (discussing exceptions to the party-presentation principle).

{¶ 96} As important as party presentation is to the adversarial process, there is a more fundamental value at stake: "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). The parties may advance legal theories about what they think the law is, but it is the judiciary that has "the ultimate authority to render definitive interpretations of the law," *TWISM Ents., L.L.C. v. State Bd. of Registration for Professional Engineers & Surveyors*, 2022-Ohio-4677, ¶ 33. This means that we

must independently determine the meaning of a constitutional or statutory provision regardless of whether a party has made a correct argument as to what the law means. *See State ex rel. Cable News Network, Inc. v. Bellbrook-Sugarcreek Local Schools*, 2020-Ohio-5149, ¶ 48 (Kennedy, J., dissenting).

{¶ 97} Judge Patrick J. Bumatay of the United States Court of Appeals for the Ninth Circuit recently explained: "'Judges are never obligated to follow the parties' agreement to incorrect law. After all, the parties don't need to ensure the best interpretation of the law. Judges do. So even though judges generally rely on the arguments the parties advance, we should never cede our duty to independently interpret the law.'" Blackman, The Volokh Conspiracy, *Judge Bumatay on Originalism, Stare Decisis, and the Party Presentation Rule* (Nov. 6, 2025), https://reason.com/volokh/2025/11/06/judge-bumatay-on-originalism-stare-decisis-and-the-party-presentation-rule/ (accessed Apr. 24, 2026), quoting Hon. Patrick J. Bumatay, Opening Address, The Federalist Society 2025 National Lawyers Convention (Nov. 6, 2025), https://www.youtube.com/watch?v=poT1A5Z_Lm8 (accessed Apr. 24, 2026). After all, "judges are not like lemmings, following the parties off of the jurisprudential cliff." Bumatay, Opening Address, The Federalist Society 2025 National Lawyers Convention, https://www.youtube.com/watch?v=poT1A5Z_Lm8 (accessed Apr. 24, 2026).

{¶ 98} Nor are we bound by the party-presentation principle when it comes to the question of subject-matter jurisdiction, a question that reaches the foundation of our constitutional structure. "Subject-matter jurisdiction refers to the constitutional or statutory power of a court to adjudicate a particular class or type of case." *Corder v. Ohio Edison Co.*, 2020-Ohio-5220, ¶ 14. "'[T]he focus is on whether the forum itself is competent to hear the controversy.'" *Id.*, quoting *State v. Harper*, 2020-Ohio-2913, ¶ 23. Because "subject-matter jurisdiction is a condition precedent to a court's power to adjudicate and render judgment in a case," *Ostanek*, 2021-Ohio-2319, at ¶ 22, "it is axiomatic that '[s]ubject-matter

jurisdiction cannot be waived and is properly raised by this court sua sponte'" (bracketed text in original), *State ex rel. Dunlap v. Sarko*, 2013-Ohio-67, ¶ 13, quoting *State v. Davis*, 2011-Ohio-5028, ¶ 11.

{¶ 99} The party-presentation principle therefore does not preclude me, and should not prevent this court, from addressing a constitutional question about the subject-matter jurisdiction of this court notwithstanding the lack of briefing and argument about it. And while I would welcome supplemental briefing on this issue, *see GateHouse Media*, 2025-Ohio-5243, at ¶ 41 (observing that the party-presentation principle may not apply when supplemental briefing has been ordered), the court has not ordered it here.

{¶ 100} The party-presentation principle is inapplicable for another reason: we must decide whether to remand this case to the court of appeals or resolve the state's third proposition of law ourselves in the first instance. That is an ancillary issue that does not resolve the federal-constitutional arguments presented, nor does it turn on the arguments the parties asserted. Importantly, this is not analogous to a situation in which a court improperly raises a novel legal theory for a party. *See State ex rel. Howard v. Chief Inspector's Office*, 2026-Ohio-1428, ¶ 60 (Kennedy, C.J., concurring in part and dissenting in part) ("Yet the majority nonetheless raises a novel argument of its own creation—an argument so novel that the chief inspector's office did not think of it").

{¶ 101} For these reasons, the party-presentation principle does not bar me or the majority from addressing the question whether this court has jurisdiction to decide the State's third proposition of law in the first instance.

{¶ 102} Before addressing the majority's resolution of the State's third proposition of law, I am compelled to address another anomaly in the majority opinion: its creation of an issue of fact.

### III. The Majority's Creation of an Issue of Fact

#### A. *The Parties Did Not Disagree About What Morris Said During His Interrogation*

{¶ 103} There is no issue of fact in this case. The State and Morris agreed with the trial court's findings as to what Morris said during his interrogation. Absent an issue of fact raised by the parties, when an appellate court reviews a ruling on a motion to suppress, the appellate court generally must defer to the trial court's findings of fact. *See State v. Burnside*, 2003-Ohio-5372, ¶ 8.

{¶ 104} In its memorandum in opposition to Morris's motion to suppress, the State relied on Morris's question, "I can't talk to a lawyer?," in support of its argument that Morris did not unambiguously and unequivocally invoke his right to counsel. The State contended that Morris's asking for a lawyer in this manner was not a clear invocation of his right to counsel. The State did not even address Morris's subsequent statement, "[Y]eah, cause that's, we goin' to do that cause I don't know what you are talking about." Had the State believed that Morris had really said he did *not* want a lawyer when making that statement, it naturally would have said so in its memorandum opposing the motion to suppress. Yet it did not.

{¶ 105} On appeal to the First District, the State did not challenge the trial court's determination that Morris said, "'[Y]eah, cause that's, we goin' to do that cause I don't know what you are talking about.'" As it did in the trial court, the State instead focused on Morris's question, "Like I can't talk to a lawyer?"—which was followed by Detective Gleckler's response, "Anyone can talk to a lawyer"—to support its argument that "Morris simply asked police a question whether he *could* see his lawyer, not that he wanted to see his lawyer." (Emphasis in original.) The State went on to assert in its First District brief that "[o]nce it was explicitly clarified for Morris that he could talk to a lawyer, Morris continued with the interview and never asked to see or talk to a lawyer during the remainder of the interview." Therefore, the State concluded, "Morris did not make a clear,

unambiguous, or unequivocal invocation of the right to counsel. Accordingly, the trial court erred when it suppressed Morris' statements on the ground that he invoked his right to counsel." So, once again, the State did not grapple with Morris's statement, "[Y]eah, cause that's, we goin' to do that cause I don't know what you are talking about."

{¶ 106} In the merit brief it filed in this court, the State not only agreed with the trial court's determination that Morris said, "[Y]eah, cause that's, we goin' to do that cause I don't know what you are talking about," but it also recited that statement in support of its position that Morris did not unambiguously and unequivocally invoke his right to counsel. Specifically, the State's brief asserts:

> About 45 minutes into the interview, Morris said, "I can't see a lawyer?" (T.p. 60, p. 13; State's Exhibit 2) Detective Gleckler responded, "anybody can talk to a lawyer." (T.p. 60, p. 13; State's Exhibit 2) After a few seconds, Detective Gleckler repeated, "anybody can talk to a lawyer," and Morris replied, "yeah cause that's – *we goin' to do that* because I don't know what you're talking about." (T.d. 60, p. 13; State's Exhibit 2) After this exchange, Morris continued answering Detective Gleckler's questions and never expressed a desire for an attorney or termination of the interview. (T.p. 19, 44-48, 50-51, 62, State's Exhibit 2)

(Record citations in original; emphasis added.)

{¶ 107} The State argues that the above exchange does not support the trial court's finding that Morris clearly and unequivocally invoked his right to counsel. The State contends that Morris was simply asking a question and that "Morris's statement questioning whether he could see his lawyer . . . was not an unequivocal invocation of the right to counsel."

42

### B. The Majority Advances an Argument Forfeited by the State

{¶ 108} Despite the agreement of the parties and the lower courts that Morris said, "[Y]eah, cause that's, *we goin' to do that* cause I don't know what you are talking about" (emphasis added), the majority inserts in its opinion a finding that Morris said something different. But that finding was created out of whole cloth.

{¶ 109} During oral argument, the author of the majority opinion told Morris's counsel that he had watched the body-camera footage of the interrogation and had heard Morris's statement differently from how it was quoted in the suppression order, the State's brief, Morris's brief, and the court of appeals' opinion. Specifically, the author of the majority opinion told counsel, "[Morris] says . . . 'we *ain't* gonna do that,' which is not what's been transcribed." (Emphasis added.) And then during his rebuttal at oral argument, counsel for the State—despite contrary language in his brief and not having had the chance to relisten to the interview—pivoted and agreed with that justice, asserting that he believed Morris had actually said, "'[H]e ain't going to do that—we're not going to do that.'"

{¶ 110} This court has recognized that an argument is lost if it is raised for the first time during rebuttal at oral argument. *State v. Johnson*, 2015-Ohio-4903, ¶ 92. "[F]orfeiture is the failure to timely assert a right or object to an error," *State v. Rogers*, 2015-Ohio-2459, ¶ 21, and here, the State's conduct throughout this case fits that description. An appellate court is not obliged to correct an error—even an *obvious* one—that has been forfeited. *Id.* at ¶ 22-23.

{¶ 111} In *State v. Quarterman*, we declined to entertain an argument that was neither presented as a proposition of law nor addressed in the appellant's merit brief and was instead raised for the first time in the appellant's reply brief. 2014-Ohio-4034, ¶ 17-20. Here, the argument the State made in its rebuttal during oral argument—that Morris declined to speak to an attorney by saying, "[H]e *ain't* goin'

to do that" (emphasis added)—came even later than that. We should not relieve the State of its forfeiture now.

{¶ 112} And even if the State had raised this factual dispute in its merit brief, we still should not entertain a proposed change to the operative facts in the first instance. *See, e.g.*, *Kiyemba v. Obama*, 559 U.S. 131 (2010) ("This change in the underlying facts may affect the legal issues presented. No court has yet ruled in this case in light of the new facts, and we decline to be the first to do so."), citing *Cutter*, 544 U.S. at 718, fn. 7.

{¶ 113} Not only did the State not contest the trial court's determination of Morris's "we goin' to do that" statement in its appeal to the lower court or before this court, it invited error based on its agreement with the trial court's finding as to that statement when arguing that he did not unambiguously or unequivocally invoke the right to counsel. So, even as the majority now dons the robes of the court-of-appeals judges in deciding in the first instance the State's fourth issue in support of the assignment of error it raised in the First District, there is still no factual dispute for the majority to resolve.

{¶ 114} Nonetheless, in advancing the authoring justice's version of Morris's statement, the majority insists that "there is some question as to what Morris said . . . . We think it is more likely that Morris said, 'Yeah cuz that's—you know we *ain't* goin' do that cuz I don't know what you talkin' 'bout.'" (Emphasis in original.) Majority opinion at ¶ 54. But is that true?

{¶ 115} In my view, it does not matter what the majority *thinks* Morris said. Absent a challenge by the State through a properly preserved assignment of error in the court of appeals and a proposition of law in this court, we should limit our review to the question of law before us—i.e., accepting the trial court's determination of what Morris said and the parties' reliance on that determination and then deciding whether Morris's statement, when viewed in context, shows that he unambiguously and unequivocally invoked his right to counsel.

{¶ 116} So, why does the majority push this alternative narrative and initiate an argument that the State did not make?  Perhaps the majority is "cert-proofing" this case from review by the United States Supreme Court.  The Court rarely grants certiorari when there is an issue of contested facts.  *See* United States Supreme Court Rule 10 ("A petition for a writ of certiorari is rarely granted when the asserted error consists of erroneous factual findings or the misapplication of a properly stated rule of law.").  Perhaps the majority is justifying its tenuous legal conclusion in this case by manufacturing this dubious issue of fact.

### C.  The Trial Court Heard Morris Correctly

{¶ 117} Regardless of the majority's motivation, this is what it claims that Morris said: "'Yeah cuz that's—you know we *ain't* goin' do that cuz I don't know what you talkin' 'bout.'"  (Emphasis in original.)  Majority opinion at ¶ 54.  But I do not hear that.  I hear what the trial court says Morris said.

{¶ 118} I do not hear a word that sounds like "ain't" in Morris's statement, nor do I hear a long "a" or a "t" sound at all.  And nothing in Morris's demeanor or the context of the questioning indicates he is saying that he does *not* want to talk to a lawyer.

{¶ 119} It simply does not make sense for Morris to have replied to Detective Gleckler like the majority says he did; were he to have said, "[W]e *ain't* goin' do that," he would have been acknowledging his right to counsel before saying he would *not* be invoking that right but then saying that he did not know what the detectives were talking about.  That leaves one bewildered.  On the other hand, it makes perfect sense for Morris to have acknowledged his right to counsel and then invoked it because he did not know where the detectives were going with their interrogation.

{¶ 120} Although the majority says that Morris said something else, it maintains that in resolving the State's third proposition of law—actually, the fourth issue the State raised in support of the assignment of error it asserted in the court

of appeals—it is nonetheless "credit[ing] the trial court's interpretation" of Morris's "we goin' to do that" statement, majority opinion at ¶ 54, fn. 2. But if it were true that the majority is relying solely on the trial court's determination of what Morris said, then why does the majority go out of its way to express disagreement with what the trial court actually found? Though I cannot answer that question, it is manifest that the State did not challenge what the trial court found Morris said, and therefore, the majority should not now question what the trial court found he said. And even if it were proper to raise this question now, the trial court's findings as to what Morris said are correct.

{¶ 121} While there is no Sixth Amendment question properly before us at this stage of the proceedings, because the majority is deciding in the first instance an issue raised under the State's assignment of error below, I proceed to address whether Morris's statements to detectives—as determined by the trial court—constituted an unambiguous and unequivocal invocation of Morris's right to counsel under the Sixth Amendment such that a reasonable police officer would have known that he was requesting an attorney.

### IV. The Sixth Amendment

{¶ 122} Ordinarily, I would begin with what happened in the case. But here, it is important to understand the law and to view the statements Morris made in this case through the lens of a reasonable police officer who has been trained in and knows the law governing the Sixth Amendment right to counsel.

### A. The Right to Counsel

{¶ 123} "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const., amend. VI. The Sixth Amendment right to counsel is perhaps the most critical of the protections guaranteed to the accused. In adopting the Sixth Amendment, "'the colonists appreciated that if a defendant were forced to stand alone against the state, his case was foredoomed.'" *United States v. Wade*, 388 U.S. 218, 224 (1967), quoting Note,

*An Historical Argument for the Right to Counsel During Police Interrogation*, 73 Yale L.J. 1000, 1033-1034 (1964).

{¶ 124} The Sixth Amendment right to counsel attaches upon "a criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, [thereby] mark[ing] the start of adversary judicial proceedings." *Rothgery v. Gillespie Cty.*, 554 U.S. 191, 213 (2008). Once the right has attached, "the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings." *Montejo*, 556 U.S. at 786. And "[i]nterrogation by the State is such a stage." *Id.* This confrontation with law enforcement "might well settle the accused's fate." *Wade* at 224.

{¶ 125} Despite its critical importance, "the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent." *Montejo* at 786. "The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled." *Id.* So, in this case, although Morris had an attorney representing him, he waived the right to counsel when he began answering the detectives' questions after he acknowledged that he understood he had a right to counsel.

{¶ 126} "[A]fter a knowing and voluntary waiver of the [right to counsel], law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Davis v. United States*, 512 U.S. 452, 461 (1994); *see also Montejo*, 556 U.S. at 794-795. "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Miranda v. Arizona*, 384 U.S. 436, 474 (1966). However, the accused "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis* at 459. The request must be unambiguous and unequivocal, *id.* at

461-462, viewed "'not in isolation but in context,'" *State v. Cepec*, 2016-Ohio-8076, ¶ 37, quoting *State v. Murphy*, 2001-Ohio-112, ¶ 32. Put differently, invocation of the right to counsel requires "'some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis* at 459, quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991).

{¶ 127} In this case, then, we should view this issue through the lens of a reasonable police officer in light of the circumstances faced by the detectives when conducting Morris's interrogation. Importantly, "[a] reasonable officer is one who has been trained in and has knowledge of the governing law," *United States v. Freeman*, 735 F.3d 92, 103 (2d Cir. 2013), including the constitutional protections embodied in the Sixth Amendment.

### B. Morris's Interrogation

{¶ 128} Detective Gleckler's body camera recorded the interrogation of Morris, which lasted for approximately two hours. During the initial 30 minutes of the interrogation, Morris remained composed and calmly admitted to being involved in a shooting in April 2022 after detectives confronted him with evidence from that incident. He explained that some people had been "messing" with his mother and that someone pulled a gun on her. Morris explained that he approached them but that he "didn't mean to shoot the people. [He] was only trying to scare them." Morris said he knew that someone had a gun, and he did not think he had hit anyone. When asked how long he had had the handgun, Morris said, "Somebody just gave it to me." He claimed that he had not been carrying a firearm before then. After discussing with the detectives what potential sentence he faced for that shooting, Morris became distressed and stated that he had "no future."

{¶ 129} The detectives then began asking Morris about a February 2022 shooting at a pizza restaurant connected to the same firearm used in the April incident. At that point, his demeanor changed. In contrast to his earlier confession, Morris vehemently denied any involvement. He told the detectives that he had

never shot the handgun other than during the April incident, and he said that he had just gotten the gun in April and whatever happened with it before April therefore had nothing to do with him. He emphasized that he did not own the firearm in February and declared, "[Y]'all can't put whatever somebody else did with that gun on me." Morris denied that he owned clothing like the clothing the suspect had worn and disputed the detectives' assertions that he had a distinctive walk. Morris again claimed that he had only recently acquired the gun and insisted, "Like, I just got it. So how could it be me?" When the detectives argued that he matched the description of the suspect and asked him how he would describe his height, Morris retorted, "Nah, I won't describe myself as nothin' right now. Cause it sounds like y'all tryin' to put somethin' else on me that I don't got nothin' to do with."

{¶ 130} At that point, Morris asked, "Like I can't talk to a lawyer?" Detective Gleckler responded, "Anybody can talk to a lawyer," and he repeated that statement after a brief pause. According to the trial court's suppression order, Morris replied, "'[Y]eah, cause that's, we goin' to do that cause I don't know what you are talking about.'" Morris's lawyer, who had been appointed at Morris's initial appearance, was not brought in, and the detectives continued the interrogation for more than an hour.

{¶ 131} Only Detective Gleckler testified at the suppression hearing. He had roughly 20 years' experience as a detective and 27 years' experience as a police officer in total. During the suppression hearing, he testified that he had been trained on "constitutional issues such as Miranda protections, [the] right to counsel, [and] privileges against self-incrimination." *See Miranda*, 384 U.S. 436. When questioned about suspects invoking the right to counsel, Detective Gleckler stated, "[W]e pretty much know the law."

{¶ 132} Detective Gleckler had talked with Morris for approximately 45 minutes before Morris asked whether he could speak to a lawyer, and a review of the interrogation recording shows that Detective Gleckler understood what Morris

was saying to him throughout the interview. There are no breaks during the interrogation in which Detective Gleckler or his partner say something like, "Can you repeat that?" or "I do not understand what you are saying." So, it is readily apparent that Detective Gleckler heard and understood what Morris was saying throughout the first 45 minutes of the interrogation.

{¶ 133} Context matters in deciding whether a reasonable officer would know that a suspect has invoked the right to counsel. *See Cepec*, 2016-Ohio-8076, at ¶ 37, citing *Murphy*, 2001-Ohio-112, at ¶ 32. Here, Detective Gleckler had just watched Morris calmly confess to the April 2022 shooting. He then saw Morris's demeanor change once questioning about the February shooting began. Detective Gleckler witnessed Morris deny multiple times that he had the handgun in February before observing him deny that his appearance was similar to the suspect's and assert that the detectives were accusing him of something he had not done.

{¶ 134} It was then that Morris asked whether he could talk to a lawyer. Detective Gleckler said that he could. In response, Morris said, "[Y]eah, cause that's, we goin' to do that cause I don't know what you are talking about."

{¶ 135} A reasonable officer under these circumstances would know that "we goin' to do that" could refer to only one thing—speaking to a lawyer. No reasonable police officer—especially one with Detective Gleckler's expertise and experience who had been interrogating Morris for 45 minutes—could have come to any conclusion other than that Morris was invoking his right to counsel.

{¶ 136} Again, Morris asked, "Like I can't talk to a lawyer?" That by itself was sufficient to invoke the right to counsel. "To hold that a suspect who asks 'Can I get an attorney?' does not invoke his right to counsel would suggest that no statement phrased as a question could invoke one's right to counsel—a holding contrary to law and lacking a fundamental understanding of the nature of human interaction." *Carter v. State*, 129 Nev. 244, 249 (2013); *see also Davis* at 461 ("questioning must cease if the suspect *asks* for a lawyer" [emphasis added]); *State*

*v. Edler*, 2013 WI 73, ¶ 35 ("Regardless of the surrounding circumstances, including [the accused's] previous experience with [the detective], we are satisfied that [the accused's] statement, 'can my attorney be present for this,' constituted an unambiguous, unequivocal invocation."); *United States v. Lee*, 413 F.3d 622, 626 (7th Cir. 2005) ("[The accused's] statement—'Can I have a lawyer?'—was similar to these statements recognized by this court as proper invocations of the right to an attorney."); *Tobias v. Arteaga*, 996 F.3d 571, 580 (9th Cir. 2021) ("[The accused's] statement—'Could I have an attorney? Because that's not me'—was an unequivocal invocation of his right to counsel under clearly established law.")

{¶ 137} In my view, the interrogation should have ended then. Instead, Detective Gleckler responded, "Anybody can talk to a lawyer," and then paused briefly before repeating that phrase. But that response does not turn an unambiguous invocation of the right to counsel into an ambiguous one. If Morris had said, "I want an attorney," a response saying that anyone can have an attorney would not make the assertion of the right to counsel any less plain. Otherwise, a request for an attorney during an interrogation would just be a word game.

{¶ 138} Morris responded to Detective Glecker's statements by saying, "[Y]eah, cause that's, we goin' to do that cause I don't know what you are talking about." That is a second clear invocation of the right to counsel. It makes no sense for Morris to have said "yeah" when told he could speak to a lawyer yet then immediately disavow any desire to talk to counsel just before continuing to deny that he had committed the February shooting, especially after he had already calmly confessed to other crimes. Nor does it make sense that, as the majority suggests, "he may have meant that he was going to talk to a lawyer in the future because he was not going to let them pin a shooting on him that he didn't do," majority opinion at ¶ 57. Nobody would think, "I'll talk to a lawyer *later* to stop the police from pinning a crime on me *now*."

**{¶ 139}** "[T]here is no exact formula or magic words for an accused to invoke his right [to counsel]." *Lee*, 413 F.3d at 625. A suspect is not required to invoke his or her right to counsel by speaking "'with the discrimination of an Oxford don,'" *Davis*, 512 U.S. at 459, quoting *id*. at 476 (Souter, J., concurring in the judgment), "nor does the law require reviewing courts to assume that law enforcement officers cannot understand plain spoken English," *Murphy*, 2001-Ohio-112, at ¶ 209 (Cook, J., concurring). After speaking with Morris for 45 minutes, becoming accustomed to the way he talked, and observing the dramatic change in Morris's demeanor when accused of the February shooting, a reasonable police officer knowing the full context of Morris's interview would have known that he wanted to speak to a lawyer.

**{¶ 140}** The majority suggests that even if Morris did say, "[W]e goin' to do that," that statement was not an unequivocal request for counsel, because he indicated an interest in speaking to a lawyer in the future by saying he was "goin' to" do that. Majority opinion at ¶ 57. But that is plainly not the case here.

**{¶ 141}** The majority is simply isolating a word from Morris's statement to achieve an outcome. It impermissibly removes the context of the statement. Morris's use of the word "goin'" is best understood by considering the words he says before it and after it. Morris said, "[Y]eah, cause that's, we goin' to do that cause I don't know what you are talking about." When Morris said he was going to speak with an attorney, he was describing a present, ongoing intention to do so because, as he explained, he did not know what the detectives were talking about. It would be no different if Morris had declared to the detectives that he wanted to speak with a lawyer "now." That the actual consultation would occur in the future was obvious, because Morris's lawyer was not there in the present. Therefore, when Morris said that he was "goin'" to speak with an attorney, he unambiguously and unequivocally expressed a present desire to speak to his lawyer.

{¶ 142} At that point, the interrogation should have stopped—but the detectives continued to question Morris. Any statements made after Morris invoked his right to counsel are inadmissible under the Sixth Amendment.

### V. Conclusion

{¶ 143} The analysis in this case should be limited to deciding the issue properly before us: whether the Ohio Constitution's right to counsel had attached at the time Morris's interrogation was initiated by law enforcement. It had not, and therefore, the First District Court of Appeals' judgment to the contrary should be reversed and this case should be remanded to that court for it to decide in the first instance whether Morris's Sixth Amendment right to counsel was violated.

{¶ 144} Instead of remanding this matter to the appellate court for it to exercise its original appellate jurisdiction as prescribed by the Ohio Constitution, the majority improperly exceeds the scope of this court's original appellate jurisdiction by donning the robes of the judges of the court of appeals and overreaching to decide an issue raised under an assignment of error that was not passed on by that court. The majority therefore disregards the structure of Ohio's courts as established by the Ohio Constitution, which grants the courts of appeals—not this court—original appellate jurisdiction to review the judgments and final orders of the common pleas courts in noncapital cases.

{¶ 145} Compelled to consider the Sixth Amendment question, I would conclude that Morris made an unambiguous and unequivocal invocation of his right to counsel, the detectives violated the Sixth Amendment by continuing to question him, and the trial court therefore correctly suppressed Morris's statements following his invocation. Because the majority holds otherwise, I dissent.

_____

Connie Pillich, Hamilton County Prosecuting Attorney, and Ronald W. Springman Jr. and Norbert Wessels, Assistant Prosecuting Attorneys, for appellant.

Raymond T. Faller, Hamilton County Public Defender, and Lora Peters and

Sarah E. Nelson, Assistant Public Defenders, for appellee.

Dave Yost, Attorney General, Mathura J. Sridharan, Solicitor General, and Samuel C. Peterson, Deputy Solicitor General, urging reversal for amicus curiae Ohio Attorney General Dave Yost.

Steven L. Taylor, urging reversal for amicus curiae Ohio Prosecuting Attorneys Association.

Elizabeth R. Miller, Ohio Public Defender, and Craig M. Jaquith, Charlyn Bohland, and Russell Patterson, Assistant Public Defenders, urging affirmance for amicus curiae Office of the Ohio Public Defender.

Cullen Sweeney, Cuyahoga County Public Defender, and Thomas T. Lampman and John T. Martin, Assistant Public Defenders, urging affirmance for amicus curiae Cuyahoga County Public Defender.

Russell S. Bensing, urging affirmance for amicus curiae Ohio Association of Criminal Defense Lawyers.

Mark Godsey and Donald Caster, urging affirmance for amicus curiae Ohio Innocence Project.

Lauren Gottesman, urging affirmance for amicus curiae The Innocence Project.

Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P., Andrew Ehrlich, Robert O'Loughlin, and Adrian Melendez-Cooper, for amici curiae Ohio Innocence Project and The Innocence Project.

Wilmer Cutler Pickering Hale and Dorr, L.L.P., and Alex Tucker Stewart, urging affirmance for amici curiae American Civil Liberties Union and American Civil Liberties Union of Ohio.

David J. Carey, urging affirmance for amicus curiae American Civil Liberties Union of Ohio.

Matthew Segal, urging affirmance for amicus curiae American Civil Liberties Union.

_____